IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RICHARD VILLARREAL | § | |
| | § | |
| VS. | § | C.A. No. __________________ |
| | § | |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY | § | |
| | § | |

**PLAINTIFF'S COMPLAINT**

RICHARD VILLARREAL, Plaintiff, files this Complaint asserting causes of action in law and equity for relief against Hartford Life and Accident Insurance Company, Defendant.

**I.**
**PARTIES**

1. Plaintiff Richard Villarreal is a resident citizen of Houston, Texas.

2. Defendant, Hartford Life and Accident Insurance Company, ("Hartford"), is a domestic or foreign insurance company licensed to do business and doing business in the state of Texas, and can be served with process by serving its registered agent, CT Corporation, 1999 Bryan St., Suite 900, Dallas, TX 75201, or wherever it may be found.

**II.**
**JURISDICTION AND VENUE**

3. This action against Hartford arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq*. This Court has jurisdiction over this action pursuant to 29 U.S.C. §1132(e)(1).

4. Venue is proper in this District and Division pursuant to 29 U.S.C. §1132(e)(2) because Defendant maintains business activity in and is in this district.

5. Pursuant to 29 U.S.C. §1132(h), this Complaint has been served upon the Secretary of Labor, Pension and Welfare Benefits Administration, at 200 Constitution Avenue N.W., Washington, D.C. 20210 and the Secretary of the Treasury at 111 Constitution Avenue N.W., Washington, D.C. 20024, by certified mail return receipt requested.

## III. STATEMENT OF FACTS

6. Mr. Villarreal worked at C&S Grocers Supply as a warehouse supervisor. Working as a warehouse supervisor meant being on his feet all day long, and the job description stated that the employee must walk 10-12 hours a day.

7. A typical day included picking up load sheets for production, which were printed across the street from the attending warehouse. As warehouse supervisor, Mr. Villarreal had to personally pick up these sheets twice a day. Each round trip between the office and the warehouse is 1.5 miles. After inspecting each pallet, verifying that they were correctly loaded, and personally shutting the trailer doors, the load sheets had to be updated with any out of stock product, pallet count, or special instructions, The updated load sheets would then be taken back to the same building as the original load sheets. There was an average of 23 loads per night.

8. Mr. Villarreal enrolled in C&S Grocers Supply's employee welfare benefit Plan that included benefits for long term disability (LTD). The Plan was part of C&S Grocers Supply's Group Insurance Policy issued by Aetna Life Insurance Company

("Aetna"). It provided income protection if an employee was disabled as a result of injury or sickness. Mr. Villarreal was an eligible employee.

9. C&S Grocers Supply was the Plan Sponsor and Plan Administrator.

10. Aetna was the Insurer of the Plan.

11. In 2017, Hartford purchased Aetna's group disability insurance business for $1.45 billion. C&S Grocers Supply was one of the policyholders whose policies were transferred from Aetna to Hartford[1].

12. Many people would struggle to keep up with the heavy physical demands of Mr. Villarreal's job. Mr. Villarreal worked through it all. If his left foot hurt, he simply applied a wound dressing, put on his shoes and socks, and went to work.

13. On October 22, 2018, Mr. Villarreal began his shift at noon and performed his daily required activities. Around 11 p.m., he began having sharp pain on the bottom of the right foot that made it uncomfortable to walk. The shift manager wanted all supervisors to walk the facility with the Director of Operations before being dismissed for the day. Because the director did not arrive until 4 a.m., Mr. Villarreal was not dismissed from his shift until 5 a.m. on October 23, 2018.

14. As soon as he got home, Mr. Villarreal called podiatrist Linda Nachmani, and he went to the earliest possible appointment on October 25. Dr. Nachmani treated the wound on the surface but never requested an MRI.

---

[1] If the C&S Grocery Supply policy is retained by Aetna, Plaintiff reserves the right to amend his Complaint to substitute Aetna as the proper insurer.

15. After four weeks of seeing Dr. Nachmani without any improvement, Mr. Villarreal was referred to a wound specialist, Dr. Chad Clause. Dr. Clause also never requested an MRI. It was not until January 15, 2019 that Mr. Villarreal got an MRI.

16. In January 2019, Mr. Villarreal was diagnosed with osteomyelitis[2] by his attending physician, Dr. Hafez. Bone infections can lead to osteonecrosis, or bone death. Areas where bone has died must be surgically removed for antibiotics to be effective. Strong intravenous antibiotics are needed after surgery.

17. In Mr. Villareal's case, he was admitted to Memorial Hermann on January 15, 2019. An X-ray revealed osteomyelitis at the base 5th proximal phalanx and distal 5th metatarsal. Two days later, he underwent surgery to scrub his foot and remove skin and bone.

18. Aetna employee James Niemi called Mr. Villarreal while he lay in his hospital bed at Memorial Hermann. Although Mr. Villarreal explained why he was undergoing the surgery, Mr. Niemi noted the surgery was the result of a diabetic ulcer.

19. Mr. Villarreal never returned to work after October 24, 2018. He applied for and received STD benefits for the maximum time period through January 29, 2019.

20. Aetna reviewed the claim to determine if Mr. Villarreal qualified for LTD benefits.

---

[2] Osteomyelitis is a bone infection. Infections can reach a bone through the bloodstream or spreading from nearby tissue. Infections can also begin in the bone if an injury exposes it to germs. https://www.mayoclinic.org/diseases-conditions/osteomyelitis/symptoms-causes/syc-20375913?page=0&citems=10

21. On February 18, 2019, Aetna employee James Niemi referred Mr. Villarreal's file to Michele Lessard, a nurse employee at Aetna. Mr. Niemi noted that Mr. Villarreal did not have a pre-existing condition that would exclude him from LTD coverage.

22. Three days later, Ms. Lessard noted that Aetna should follow up with Mr. Villarreal's doctors to find out how his wound was healing. She also recommended that Aetna consider alternative occupations for which Mr. Villarreal might qualify or vocational training to find a new career.

23. Ms. Lessard also advised that Mr. Villarreal should "avoid improper foot wear such as heavy work boot and avoid being on feet for excessive periods of time". In other words, Ms. Lessard agreed that Mr. Villarreal could not work in his own occupation because it required 1) heavy work boots and 2) walking long distances.

24. On February 22, 2019, Aetna employee Dr. Mark Williams reviewed some of Mr. Villarreal's medical records. He concluded that Mr. Villarreal's disability was caused or contributed to by diabetes.

25. By using the title of medical director, Mark Williams holds himself out as a licensed physician. However, there is no evidence that he is licensed to practice medicine in Texas or any other state. There is no evidence that he maintains an active medical license. This is because <u>he is not a physician at all</u>. He has been a chiropractor since 2017. Indeed, Aetna's very use of the term "medical director" for its in-house chiropractor is misleading and suspect.

26. However, "Dr." Williams is a veteran of the insurance industry. He began as a clinical consultant at Unum from 2000-2005. He then moved to Aetna, where he continued as a clinical consultant. In October 2010, he was promoted to clinical

manager. From 2015-2018, he also served as a “senior medical business consultant”. In 2018, he moved to Hartford to become medical director, where he got involved in mismanaging Mr. Villarreal’s claim.

27. His lack of qualifications and bias are patently obvious in this claim. “Dr.” Williams spent a grand total of 5.5 lines of analysis of this claim. Perhaps his time is too important at Hartford, and he must rush to deny other claims as quickly as possible to boost his employee metrics and pocketbook. Like Ms. Lessard, “Dr.” Williams spread misinformation by stating “the records document a lack of protective sense in the feet”. In other words, “Dr.” Williams accused Mr. Villarreal of choosing to go to work and walking up to a dozen miles a day, in steel toed heavy duty work boots without socks. Of course, he was wrong.

28. “Dr.” Williams concluded that there was adequate medical evidence that diabetes caused or contributed to Mr. Villarreal’s osteomyelitis. Of course, “Dr.” Williams lacks the education, training, or experience to make any kind of medical judgment in this regard. A chiropractor has nothing useful to offer regarding foot ulcers, diabetes, proper footwear, or osteomyelitis. It is doubtful that “Dr.” Williams is even familiar with osteomyelitis. Hartford would have gotten better evidence from a simple Google search than relying on its trained mouthpiece.

29. Aetna’s misinformation campaign spread throughout the claim. The same day as “Dr.” Williams’s review, Aetna employee Susan Norton concluded that Mr. Villarreal “was wearing shoes without socks and being on his feet for 12 hour days”. She then made a medical diagnosis that Mr. Villarreal had poorly controlled

diabetes, a history of foot ulcers, and that diabetes contributed to osteomyelitis on his right foot.

30. Three days later, Aetna denied Mr. Villarreal's claim. In doing so, it concluded that his claim was excluded because a pre-existing condition caused or contributed to his disability.

31. Mr. Villarreal appealed Aetna's denial of his LTD claim on March 5, 2019. In his appeal, he explained that he did not suffer from a pre-existing condition. While he had a history of foot ulcers, they were only in his left foot. His disabling condition, osteomyelitis, was in his right foot. He had no history of osteomyelitis or other bone infections.

32. On March 12, 2019, Mr. Villarreal had a phone conference with Aetna employee Christi Coen. Mr. Villarreal explained that he was diagnosed with osteomyelitis, not a diabetic ulcer. Ms. Coen responded that although he was ultimately diagnosed with osteomyelitis, at the time he stopped working, it could only have been due to diabetes and a diabetic ulcer.

33. Aetna denied Mr. Villarreal's appeal on April 25, 2019.

34. In reviewing Mr. Villarreal's appeal, Aetna paid for a medical record reviews by Ilya Beylin. A careful review of Dr. Beylin's medical report reveals that she provided Aetna with all of the evidence necessary to reverse its wrongful denial. Not only did she conclude that Mr. Villarreal was disabled from his own occupation, she also concluded that a pre-existing condition did not cause or contribute to his disability.

35. Dr. Beylin's review covered the time period from May 2018-February 2019. She began by reviewing Dr. Nachmani's records. Dr. Beylin determined that, as of June

27, 2018, there was no evidence of osteomyelitis. As such, osteomyelitis could not be a pre-existing condition. She then summarized Mr. Villarreal's medical treatment from October 28, 2018 through January 24, 2019. Finally, she concluded:

> From 10/28/2018 through 01/14/2019 and from 01/25/2019 through the present, the claimant would be able to perform sedentary physical demand.
>
> From 01/15/2019 through 01/24/2019, the claimant was hospitalized and would have been totally functionally impaired.

36. **This statement, by itself, proves that Mr. Villarreal met the definition of disability**. Aetna knew that his job description required him to do heavy work with miles and miles of walking on a daily basis. The ability to do sedentary work would not permit him to work in his own occupation.

37. But Dr. Beylin went on to offer even more useful evidence. Aetna asked her to opine on whether there was a "medical relationship" between treatment between May 19, 2018-August 19, 2018 and his impairment. Dr. Beylin answered the question as follows:

> The claimant was treated for left foot superficial ulcers between 05/19/2018 and 08/19/2018. There is no medical relationship between any treatment received between 05/19/2018 and 08/19/2018 and the claimant's current impairment caused by osteomyelitis of the right foot.
>
> There is no medical relationship between treatment received on 05/19/2018 and 08/19/2018 for superficial left foot ulcerations and the claimant's current impairment, which is due to right foot ulcer and osteomyelitis. Ulcerations on the left foot and treatments for them could not have caused osteomyelitis of the right foot.

38. This common-sense answer should be obvious to anyone who can distinguish right from left. Between June and August 2018, Mr. Villarreal was treated for foot ulcers on his left foot. He went out of work in October 2018 due to pain in his right foot,

which was later diagnosed as osteomyelitis. As Dr. Beylin stated, "ulcerations on the left foot could not have caused osteomyelitis of the right foot". As such, Dr. Beylin concluded that Mr. Villarreal's alleged pre-existing condition (ulcers on his left foot) did not cause or contribute to his disability (osteomyelitis in his right foot).

39. Aetna knew this claim was covered, but it still tried to avoid facing reality. Two days later, Aetna employee Shailendra Gupta summarized Dr. Beylin's medical record review. Mr. Gupta acknowledged that Dr. Beylin found no direct link between left foot ulcers and osteomyelitis of the right foot. However, he substituted his own judgment for that of an actual podiatrist by concluding, "Diabetes, diabetic neuropathy often leads to skin breakdown, which causes ulcerations, which consequently leads to infections". Aetna used this garbled justification to deny the appeal 5 days later.

40. It is not sufficient for Aetna to discuss medical generalities. The Policy's pre-existing condition exclusion requires the pre-existing condition to cause or contribute to the cause of disability. The question in this claim is not, "Is it theoretically possible for someone with diabetes to get skin infections?" The question is, "Did ulcers on Mr. Villarreal's left foot cause osteomyelitis in his right foot?" Dr. Beylin answered this question unequivocally. Aetna ignored her.

41. By ignoring the conclusions of a paid medical record reviewer and substituting in the judgment of an unqualified employee, Aetna allowed its own bias to blind it to the evidence in this claim. This was *de novo* wrong, and it was also an abuse of any

discretion Aetna might claim. This pattern of conduct evidences a biased approach and treatment of Aetna's disability claims, including this one.

42. On February 20, 2020, Mr. Villarreal submitted additional evidence in support of his claim. Among other things, he provided medical records from four different medical providers in support of his claim. He provided additional evidence of his disabling pain and the side effects of his various medications. He also pointed out the evidence of bias and lack of credibility of "Dr." Williams, while at the same time noting all the useful evidence provided by Dr. Beylin that Aetna discarded. He provided the results of a February 2020 Functional Capacity Examination that evidenced his ongoing inability to work in his own occupation. The additional evidence was provided pursuant to Fifth Circuit case authority that obligated Unum to review the additional information. ("The administrative record consists of relevant information made available to the administrator prior to the . . . filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it".) *Vega v. National Life Ins. Services, Inc.*, 188 F.3d 287, 300 (5th Cir. 1999). *Vega* has been repeatedly upheld by the 5th Circuit, most recently in *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246 (5th Cir. 2018). Mr. Villarreal asked Aetna to review those records pursuant to its legal obligation and re-evaluate his claim.

43. The evidence that Mr. Villarreal sent in February 2020 was submitted before filing this lawsuit and in a manner that gave Aetna and Hartford a fair opportunity to consider it.

44. Instead, on March 10, 2020, Hartford advised Mr. Villarreal that it had not changed its decision on his claim, despite the additional evidence. While it characterized the additional evidence as another appeal, it did not reverse its wrongful denial of Mr. Villarreal's claim.

45. Having exhausted his administrative remedies, Richard Villarreal brings this action to recover the LTD benefits promised in the Plan and Policy.

**IV.**
**CLAIMS & CAUSES OF ACTION**

46. The C&S Grocers Supply Plan is governed by ERISA. 29 U.S.C. §1001, *et. seq*. C&S Grocers Supply is the plan sponsor and Plan Administrator. Aetna was the insurer and Claim Administrator under the Plan until 2017. Since 2018, Hartford has been the insurer and Claim Administrator under the Plan.

47. As Plan fiduciaries, Hartford and the Plan are obligated to handle claims for the benefit of the Plan and Plan beneficiaries, and to deliver the benefits promised in the Plan. They are also obligated as fiduciaries to conduct their investigation of a claim in a fair, objective and evenhanded manner.

48. Hartford's adjustment of the Villarreal claim was instead biased and outcome oriented. This was partly reflected by its denial of the Villarreal claim, even after being presented with evidence of his disability. It was also reflected in Hartford's unreasonable reliance on reviewers who lacked the training, education, and experience to objectively or competently review his claim.

49. Hartford's interpretation of the Plan was not legally correct. It was also contrary to a plain reading of the Plan language.

50. Hartford's interpretation of the Plan and Plan language was contrary to that of the average Plan participant and policyholder. It was contrary to the common and ordinary usage of the Plan terms. Alternatively, the Policy language upon which Hartford based its denial decision was ambiguous. The ambiguous nature of those terms requires those terms be construed against Hartford and the Plan and in favor of coverage for Villarreal.

51. Hartford's denial was made without substantial supporting evidence. Its decision to deny the Villarreal claim was instead based upon rank speculation and guesswork. Hartford's denial decision was *de novo* wrong. Alternatively, it was arbitrary and capricious.

52. At all material times, Hartford acted on behalf of the Plan and in its own capacity as the Insurer and as Claims Administrator.

53. Hartford's termination of the Villarreal claim breached the terms of the Plan. This breach was in violation of 29 U.S.C. §1132(a)(1), entitling Villarreal to the LTD policy benefits to which he is entitled, along with pre-judgment interest on the amounts due and unpaid, all for which Mr. Villarreal now sues.

## V.
## STANDARD OF REVIEW

54. The default standard of review for denial of a benefit claim is *de novo.* Where the Plan or Policy confers discretion on the Claims Administrator, an abuse of discretion standard of review may apply.

55. The Plan or Policy may contain a discretionary clause or language Hartford may contend affords it discretion to determine eligibility for benefits, to interpret the

Policy, and determine the facts. Hartford's denial under this standard of review, if any, was an abuse of discretion. It was arbitrary and capricious.

56. If discretion applies, the Court should afford Hartford less deference in light of its financial conflict of interest. Hartford's conflict of interest is both structural and actual. Its structural conflict results from its dual role as the adjudicator of Villarreal's claim and as the potential payor of that claim.

57. Hartford's actual financial conflict is revealed in the policies, practices, and procedures influencing and motivating claim delays and denials for financial gain. Hartford's financial conflict is also revealed in the high return gained from the delay in payment or denial of claims. This institutional financial conflict has been revealed in other cases.

58. Each of these grounds, on information and belief, was a motive to deny Plaintiff's claim, along with the delay in payment or denial of claims of other Hartford policyholders and claimants.

59. In light of its financial conflict, Hartford should be given little or no discretion in its claims decision[3].

60. Alternatively, the standard of review of this claim should be *de novo,* affording Hartford no discretion in its interpretation of the terms of the Policy and Plan or in its factual determinations. Both factual conclusions and legal determinations are reviewed *de novo* by the Court. *Ariana v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246 (5th Cir. 2018).

[3] If Aetna is the proper insurer, Plaintiff reserves the right to amend his Complaint with additional detail about Aetna's use of predictive modeling, where it uses variables to predict the likelihood that a particular action on a claim will lead to a financial windfall for denying a claim.

61. The Plan or Policy was delivered in Texas and is subject to the laws of that jurisdiction. Accordingly, Texas law applies under the ERISA savings clause. Texas has banned the use of discretionary clauses in insurance policies issued in this state. TEX. INS. CODE §1701.062; 28 Tex. ADMIN. CODE §3.1202. The Hartford Policy is subject to the Texas discretionary clause ban. Accordingly, review of the Villarreal claim and Hartford's claims handling conduct, both in its interpretation of terms of the Policy and the Plan, and in its determination of the facts, should be *de novo.*

**VI.**
**REQUEST FOR PREJUDGMENT INTEREST & AN ACCOUNTING**

62. Mr. Villarreal requests, in addition to the amount of benefits withheld, prejudgment interest on any such award. He is entitled to prejudgment interest as additional compensation, and pursuant to Texas Insurance Code Texas Insurance Code, Sec. 1103.104, or on principles of equity.

63. The Plan and Policy do not contain a rate of interest payable on the benefit amount wrongfully withheld. Resort must be had to Sec. 1103.104(c) of the Texas Insurance Code. Villarreal thus requests an accounting in order to determine the amount earned on the funds that should have rightfully been paid to him, and in accordance with Insurance Code Sec. 1103.104(c).

**VII.**
**CLAIM FOR ATTORNEYS FEES & COSTS**

64. Mr. Villarreal seeks an award of his reasonable attorneys' fees incurred and to be incurred in the prosecution of this claim for benefits. He is entitled to recover those fees, together with his costs of court, pursuant to 29 U.S.C. §1132(g).

**VIII.**

**PRAYER**

Richard Villarreal, Plaintiff, respectfully prays that upon trial of this matter or other final disposition, this Court find in his favor and against Defendant Hartford Life and Accident Insurance Company, and issue judgment against it as follows:

A. Pay to Mr. Villarreal all benefits due and owing in accordance with the terms of the Plan and Policy, as well as all prejudgment interest due thereon and as allowed by law and equitable principles;

B. Pay all reasonable attorney's fees incurred and to be incurred by Mr. Villarreal in obtaining the relief sought herein, along with the costs associated with the prosecution of this matter; and

C. All such other relief, whether at law or in equity, to which Mr. Villarreal may show himself justly entitled.

Respectfully submitted,

By: /s/ Amar Raval

Amar Raval, TBA #24046682
S.D. No. 619209
Berg Plummer Johnson & Raval LLP
3700 Buffalo Speedway, Suite 1150
Houston, TX 77098
(713) 526-0200
(832) 615-2665 (Fax)
araval@bergplummer.com

ATTORNEYS FOR PLAINTIFF